FILED

2010 Mar-10  PM 01:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **MARY LOUISE READUS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 5:08-CV-1675-VEH** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **COMMISSIONER OF** | ) |
| **SOCIAL SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM OPINION

Plaintiff, Mary L. Readus ("Ms. Readus") appeals a final decision of the Commissioner of the Social Security Administration (the "Commissioner") under 42 U.S.C. § 405(g) of the Social Security Act ("SSA"). Ms. Readus timely pursued and exhausted her administrative remedies. This case is ripe under 42 U.S.C. § 405(g).

## STATEMENT OF THE CASE

### A. Procedural History

Ms. Readus applied for disability status commencing December 6, 2005, and disability insurance ("DIB") on March 9, 2006.[1]  (Tr. 115).  The Commissioner

---

[1] This is Ms. Readus's third Social Security claim.  She previously applied for the same, alleging disability commencing in 1989 and 1992.  (Tr. 130).

denied her claim on June 22, 2006. (Tr. 50). Ms. Readus requested a hearing before

an administrative law judge ("ALJ") on June 27, 2006, which was held on December

17, 2007. (Tr. 56; 23). The ALJ denied her application on February 9, 2008. (Tr. 5).

On February 24, 2008, Ms. Readus sought review of the ALJ's decision, but

it was denied on July 9, 2008. (Tr. 1). On September 11, 2008, she filed this appeal.

(Doc. 1)[2]. As explained below, the court affirms the Commissioner's decision.

### B. Factual History

### 1. Relevant Medical History[3]

On March 5, 2005, Ms. Readus saw Dr. James F. Gauthier, M.D., of the

Occupational Health Group in Huntsville, after she injured her back while working

at Huntsville Hospital. (Tr. 193). During the visit, Ms. Readus was in "moderate

pain." *Id.* Dr. Gauthier noted that she exhibited a slight left leg discrepancy and

---

[2]On February 4, 2009, this appeal was reassigned to the undersigned judge. (Doc. 9).

[3] This section discusses only Ms. Readus's medical history related to her claim. While her medical records establish that she suffers from hypertension, congestive heart failure, and diabetes, the records do not indicate that these conditions cause pain. Further, the records are dated 1999-2001 (Dr. Gordon Cash) and January of 2006 (Dr. Elizabeth Harden). (Tr. 250-52; 255-56; 225-36). Since, as explained in subsection 2 of this section, Ms. Readus was employed through December 31, 2006, and thereby not disabled during that time, there is no evidence that these conditions limited her ability to perform certain jobs during the period in which she claims disability. Although Ms. Readus testified that she had experienced other blood pressure-related problems, specifically an emergency room visit in November of 2006, she did not answer the ALJ's request for those medical records and failed to offer an excuse. (Tr. 8; 24; 26-7; 34). She also testified that she was diagnosed with vision problems associated with diabetes in 2003, but offered no evidence to corroborate this claim. (Tr. 42).

"move[d] all extremities except the left leg well." *Id.*

The next day, Dr. Gauthier x-rayed Ms. Readus's lumbar spine and concluded that she had spondylolisthesis at L4-5 and severe degenerative disc disease at L5-S1. (Tr. 194). He prescribed physical therapy and pain medication, and advised her not to return to work until she could be examined by a spine surgeon. *Id.*

From March of 2005, through January of 2006, Ms. Readus visited Dr. Gilbert M. Aust, M.D., an orthopedic surgeon, five times. On March 15, 2005, Dr. Aust diagnosed Ms. Readus with a lumbar sprain superimposed on degenerative spondylolisthesis L4-5. (Tr. 222). He recommended that she continue her pain medication and physical therapy, as it had helped to alleviate her pain. (Tr. 223).

On March 21, 2005, Dr. Aust x-rayed Ms. Readus's lumbar spine. (Tr. 220). He assessed that she had suffered a spontaneous fusion anteriorly at L5-S1, where she had experienced a significant vertical collapse. *Id.* The x-rays also showed a 13 mm spondylolisthesis at L4-5, but her remaining discs were normal. *Id.*

Additionally, Dr. Aust compared the x-rays to her previous scans and observed "a significant advance in [Ms. Readus's] pathology" since 2001. *Id.* He confirmed his previous diagnosis that she had a sprain superimposed on advanced degenerative spondylolisthesis L4-5 and a vertical segmental collapse L5-S1 with spontaneous anterior fusion. *Id.* Dr. Aust told Ms. Readus that she could return so work, under

permanent restrictions, including no lifting over twenty-five pounds, repetitive lifting, bending, or stooping. *Id.* He told her she would eventually need surgery because she was "developing a very significant stenosis at L4-5." *Id.* At Dr. Aust's request, Ms. Readus attended physical therapy.[4] (Tr. 207-215).

On May 23, 3005, Ms. Readus returned to Dr. Aust. During this visit, Dr. Aust determined that she had "recovered satisfactorily" from her lumbar sprain and had reached her maximum medical improvement level (MMI). (Tr. 219). Although Dr. Aust reiterated that she would eventually need back surgery, he cleared her to perform light work, subject to the restrictions he had previously imposed, in order to "maximize the amount of time before she [needed surgery]." *Id.* He instructed her to return when her condition worsened. *Id.*

On August 15, 2005, Ms. Readus visited Dr. Aust because she wanted him to clear her to return to regular work. (Tr. 218). Although he expressed reservations, Dr. Aust lifted the restrictions and cleared her to return to regular work. *Id.* Dr. Aust advised Ms. Readus to return when her symptoms impaired her such that she was ready to address her condition surgically. *Id.*

On January 17, 2006, Ms. Readus visited Dr. Aust for the final time and told

---

[4] Ms. Readus's records from the Therapy and Sports Center at Huntsville Hospital are extremely difficult, if not impossible, to decipher. (*See* Tr. 207-215).

him that her pain had required her to quit working at Huntsville Hospital.  (Tr. 217).

He told her that her condition would improve "considerably" with surgery but she

was "concerned about having anything done."  *Id.*  Instead, Ms. Readus wanted to

know her impairment rating.  *Id.*  Dr. Aust assessed that her body as a whole was

approximately 20% impaired.  *Id.*  During this visit, Dr. Aust observed that she had

"apparently contacted a lawyer."  *Id.*

On May 15, 2006, Ms. Readus was examined by a consultative medical

examiner, Dr. Clement P. Cotter, M.D.  Ms. Readus told Dr. Cotter that she had been

injured in March of 2005 when she had to catch a 350 lb. patient while working at

Huntsville Hospital.  (Tr. 258).  She complained that "her spine was 'cracked' all the

way down;" that she had difficulty walking, standing, and sitting; and that she had

been unable to work since the incident in March of 2005.  *Id.*

Dr. Cotter did not perform any laboratory tests.  (Tr. 258-261).  He assessed

that Ms. Readus exhibited normal range of motion of the cervical spine, shoulder,

elbow, forearm, hip, knee, ankle, wrist, hands, and fingers.  (Tr. 262-263).  However,

she exhibited abnormal range of motion of the dorsolumbar spine.  (Tr. 262).

Dr. Cotter concluded that Ms. Readus's "long term prognosis [...] is poor,"

because she has experienced back pain since her injury in March of 2005; been under

the care of an orthopedic surgeon for her injury; and "has other debilitating problems

as well." (Tr. 261). He further noted that "he did not feel that rehabilitative efforts would be helpful." *Id.* This was the extent of his explanation for his prognosis. *Id.*

On June 9, 2006, Tanya King, a state agency consultant, reviewed Ms. Readus's medical records. She determined that Ms. Readus's daily activities and medical records did not reveal a mental impairment and thus, no psychiatric review was necessary. (Tr. 264). Ms. King assessed that Ms. Readus can occasionally lift or carry up to 20 lbs; frequently lift or carry up to 10 lbs; and stand and/or walk (with normal breaks) for about six hours in an 8-hour workday. (Tr. 266). She also determined that Ms. Readus has unlimited capacity to push and/or pull, including operation of hand and/or foot controls; may frequently engage in climbing up inclines, balancing, and kneeling; and may occasionally engage in stooping, crouching, or crawling. *Id.* Ms. King further determined that Ms. Readus's medically determinable impairments, although reasonably capable of producing some of her alleged symptoms, allegedly limited her to an extent inconsistent with the objective findings that she has a normal gait, her lumbar flexion is 75 degrees, her extension is 20 degrees, and she has normal joint capacity. (Tr. 270).

## 2. Past Work History

Records from Huntsville Hospital indicate that Ms. Readus was employed there as a greeter from November 2003, through January 2006. (Tr. 140). However, Ms.

6

Readus stated in her Disability Report that she worked at Huntsville Hospital as a patient care technician from 1996, until December 6, 2005, the day she allegedly became disabled.[5]  (Tr. 150-51).  She also indicated that she stopped working at that time because her physician instructed her to do so and the hospital would not "give her another job."  *Id.*  She testified four times that she was fired because of her back problems.  (Tr. 31; 32; 43).

Ms. Readus's wage records show that she was employed by Private Duty Nursing Services, Inc. in Decatur during the first quarter of 2006.  (Tr. 125). Additionally, her records show that she earned wages from Pleasant Grove Nursing and Rehabilitation Center in Orchard Park during the first, second and third quarters of 2006 (Tr. 126, 122, 124) and the first quarter of 2007 (Tr. 120).  Files were never requested from Pleasant Grove because Ms. Readus initially denied working there at all and did not know how or why Pleasant Grove had obtained her social security information.  (Tr. 132).  During the ALJ hearing, she testified that she worked there for two months.  (Tr. 28).

Ms. Readus received state unemployment benefits during the first, second, and

---

[5] Although Ms. Readus's Disability Report is inconsistent with the records provided by Huntsville Hospital with respect to Ms. Readus's job there, other evidence shows that Ms. Readus was more than a greeter at the hospital.  For example, in October of 2000, Dr. Cash reported that she was employed in the cardiac medical unit of Huntsville Hospital.

third quarters of 2006. (Tr. 128-29). She testified that she had stated that she was ready, willing, and able to work when she applied for unemployment compensation. (Tr. 31). She further testified that she told the State that "[she] couldn't work because of [her] back." *Id.*

Ms. Readus's records indicate that she earned wages at Inprax Performance Resources ("IPR") in Huntsville from July 2006 through January 2007, during the third and fourth quarters of 2006, and the first quarter of 2007. (Tr. 121-23; 136-37). However, Ms. Readus testified that she only worked at IPR for three months. (Tr. 29). She said she "tried to work there" but her back problems rendered her unable to perform her job, which required lifting radios and a lot of walking. (Tr. 28).

Also during the first quarter of 2007, Ms. Readus was employed by Guided Footprints In Home Care in Huntsville. (Tr. 121). She testified that she was a private home sitter. (Tr. 29).

She was hired by Aramark Healthcare in February of 2007 and, at the time of the hearing, was still employed there as a part-time hospitality assistant. (Tr. 29). In this position, Ms. Readus prepares meals, cleans, and serves food trays in the Huntsville Hospital cafeteria. *Id.* She testified that her jobs requires a lot of standing, which is difficult because of her leg problems associated with diabetes. *Id.*

Additionally, Ms Readus received state unemployment benefits during the first,

8

second, and third quarters of 2007.  (Tr. 128).

### 3.  Ms. Readus's Testimony

Ms. Readus testified that her blood pressure medicine is ineffective.  (Tr. 33).
She described her hypertension as "uncontrolled."  (Tr. 34).  She further testified that
her medication causes nausea and keeps her awake at night.  (Tr. 33).

Ms. Readus stated that she experiences pain at a level of 7/10, daily.  (Tr. 36).
She stated that her diabetes causes significant leg and foot pain.  (Tr. 33).  As a result,
she can only stand up for a few minutes at a time.  (Tr. 36). She stated that pain starts
at the upper back of her legs and goes down, causing her feet to burn.  (Tr. 37-8).

Even though she is supposed to work twice a week, she testified that one day
of work leaves her in so much pain that she cannot work a second day.  (Tr. 38). She
stated that her legs hurt so bad that she cannot walk from the bed to the bathroom.
*Id.*  When asked whether she can walk an average street block or a football field, she
said no because she gets out of breath.  (Tr. 37).

Due to back problems, Ms. Readus testified that she cannot sit for long periods
of time.  (Tr. 36).  She stated that she continued to work despite her pain, in order to
have access to medication.  (Tr. 42).  She stated that she could no longer see Dr. Aust,
because she does not have insurance.  (Tr. 32).

Ms. Readus testified that she can "probably" lift a gallon of milk.  *Id.*  When

9

asked to lift the approximately six pound microphone at the ALJ hearing, she said it "hurt pretty bad." *Id.*

Ms. Readus stated that she can only clean five to ten trays before she is in too much pain to work. (Tr. 38). She attributed her inability to clean trays to arthritis in her hand and pain in both arms, which she had only recently begun to feel. *Id.* She stated that she goes home early when the pain becomes too much to handle. (Tr. 39).

Ms. Readus testified that she rarely drives. *Id.* She testified that she is able to bathe and dress herself. *Id.* She lives with her disabled husband. (Tr. 41). She stated that her daughter, who lives in Madison, comes over every day to help them. (Tr. 40). She stated that her daughter usually does housework and cooks for them. (Tr. 39-40).

### 4. Vocational Expert Opinion

During the ALJ hearing, a vocational expert, John McKinney, testified as to Ms. Readus's past work and job skills. Mr. McKinney classified Ms. Readus's past relevant work as a nursing assistant, which is medium work ranging from heavy to semi-skilled; a production inspector, which is unskilled light work; and a cafeteria attendant, which is unskilled light work. (Tr. 44). He also stated that Ms. Readus's skills from her work as a nursing assistant are not transferable to sedentary work. *Id.*

## STANDARD OF REVIEW

This court will determine whether the Commissioner's decision is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales,* 402 U.S. 389, 390 (1971); *McRoberts v. Bowen,* 841 F.2d 1077, 1080 (11th Cir. 1988); *Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1983); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence," and will determine that the ALJ's opinion is supported by substantial evidence if it finds "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth*, 703 F.2d at 1239. Substantial evidence is "more than a scintilla, but less than a preponderance." *Id.*

## STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits and establish disability status, a claimant must be disabled under the SSA and the Regulations promulgated thereunder.[6] The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

---

[6]The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of June 12, 2009.

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must establish a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1508.

The Commissioner employs the following five-step sequential evaluation, to determine whether a claimant is disabled:

(1)     whether the claimant is currently employed;
(2)     whether the claimant has a severe impairment;
(3)     whether the claimant's impairment meets or equals an impairment listed by the Secretary;
(4)     whether the claimant can perform his past work; and
(5)     whether the claimant is capable of performing any work in the national economy.

20 C.F.R. § 404.1520(a)(4)(i-v);  *Pope v. Shalala*, 998 F.2d 473, 477  (7th Cir. 1993) (citing to former applicable C.F.R. section),  *overruled on other grounds by Johnson v. Apfel,* 189 F.3d 561 (7th Cir. 1999); *accord,  McDaniel v. Bowen*,  800 F.2d 1026, 1030  (11th Cir. 1986).  "Once the claimant has satisfied steps one and two, he will automatically be found disabled if he suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform his work, the burden shifts to the Secretary to show that the claimant can perform some other job."  *Pope*,  998 F.2d

at 477; *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner must show that such work exists in the national economy in significant numbers. *Foote*, 67 F.3d at 1559.

## FINDINGS OF THE ADMINISTRATIVE LAW JUDGE

The ALJ applied the above five-step process and found that Ms. Readus was not disabled, or entitled to disability benefits, from December 6, 2005, to February 9, 2008. Below is a summary of the ALJ's findings:

### (1) Employment

The ALJ found that Ms. Readus engaged in substantial gainful activity from July of 2006, through December of 2006, because she received an income of $6,395.84, earning $5,687 in 2006, while working for IPR. (Tr. 10).

The ALJ found that Ms. Readus had not engaged in substantial gainful activity from December 31, 2006, through the day of his decision, February 9, 2008. (Tr. 11).

### (2) Severe Impairment

The ALJ found that Ms. Readus is severely impaired, under 20 C.F.R. § 404.1520(c)(1), with the following: (1) lumbar degenerative disc disease with advanced degenerative spondylolisthesis L4-5; (2) vertical segmental collapse L5-S1 with spontaneous anterior fusion; (3) hypertension; (4) congestive heart failure; and (5) non-insulin dependent diabetes mellitus. (Tr. 11 (citing 20 CFR 404.1520(c))).

13

Despite these severe impairments, the ALJ concluded that the objective medical evidence "shows that [Ms. Readus] has no restriction of daily activities, no difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation." (Tr. 12). The ALJ's conclusion concurred with Tanya King, the state agency consultant. *Id.*

### (3) Severe Impairment within Regulations

The ALJ found that Ms. Readus does not have an impairment or combination of impairments that meets or medically equals those listed in 20 C.F.R. § 404, Subpt. P, App.1. (Tr. 12).

### (4) Past Relevant Work

The ALJ found that Ms. Readus is unable to perform any past relevant work under 20 C.F.R. § 404.1565 because the exertional demands of her previous employment exceed her current residual functional capacity ("RFC"). (Tr. 14). The ALJ classified Ms. Readus's past relevant work based on a vocational expert opinion. *Id.* Her past relevant work is classified as a nursing assistant, semi-skilled worked requiring medium exertion; production inspector, unskilled work requiring light exertion; and cafeteria attendant, unskilled work requiring light exertion. *Id.*

### (5) Capability of Performing Work in the National Economy

The ALJ found that Ms. Readus is able to perform a full range of sedentary

14

work.  (Tr. 12).  The ALJ considered Ms. Readus's alleged symptoms and the extent to which her symptoms were reasonably consistent with the evidence, as required by 20 C.F.R. 404.1529; SSRs 96-4p and 96-7p; 20 C.F.R. 404.1527; and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.  *Id.*

The ALJ further determined that Ms. Readus is capable of performing work in the national economy.  (Tr. 15).  The ALJ relied solely on the Medical-Vocational Guidelines in reaching this conclusion.  (Tr. 14-15) (citing 20 C.F.R. 404.1563-64). He assessed that Ms. Readus has a limited education; is able to communicate in English; and is a younger individual.  *Id.*  He also stated that transferability of job skills was immaterial to his determination.  *Id.*  (citing C.F.R. Part 404, Subpart P, App. 2 and SSR 82-41).[7]  The ALJ used opinion evidence, as it is defined under 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.  *Id.*

Furthermore, the ALJ used the three-part pain standard in deciding Ms. Readus's RFC.  While Ms. Readus has an underlying medical condition, the ALJ determined that the medical evidence "does not support her allegations of severe and chronic pain and limitation of function to the degree that it would preclude the

---

[7]Although they lack the force of regulations, Social Security Rulings are "binding on all components of the Social Security Administration."  20 C.F.R. § 402.35(b)(1); *see also McCloud v. Barnhart*, 166 Fed. Appx. 410 (11th Cir. 2006), 2006 WL 177576 (citing SSR 96-6p as authoritative, for example).

performance of all substantial gainful activity." (Tr. 14).  The ALJ claimed to have "discount[ed] the non-specific finding" of Dr. Cotter, a consultative examiner, in favor of the opinion of Dr. Aust, her treating physician, who had restricted her to light work with specific limits.  *Id.*  The ALJ considered Dr. Aust's reservations in releasing Ms. Readus to perform medium work in August of 2005, and, instead of determining that she could do restricted light work, found that she could only perform sedentary work.  *Id.*

The ALJ discredited Ms. Readus's claims as to the intensity, persistence, or functionally limiting effects of her condition.  (Tr. 14)*.*  First, he found her allegations "inconsistent with her daily living activities including some driving."  *Id.*  Second, Ms. Readus received state unemployment benefits during the first and second quarters of 2006 and the first, second, and third quarters of 2007.  (Tr. 14).  The ALJ found:

> Application for and receipt of unemployment compensation benefits in the State of Alabama are inconsistent with a claimant's alleged disability. Alabama law specifically precludes eligibility for such benefits where the claimant is unemployed due to sickness or disability. Section 25-4-78, Code of Alabama of 1975 as amended. Further, to be eligible for such benefits, the claimant must be "... physically and mentally able to perform work of a character which he is qualified to perform by past experience or training, and he is available for such work...." Section 25-4-77, Code of Alabama of 1975 as amended.

*Id.*

16

<u>ANALYSIS</u>

<u>THE ALJ'S APPLIED THE CORRECT LEGAL STANDARDS IN
CONCLUDING THAT MS. READUS IS NOT DISABLED AND HIS
DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE.</u>

## I.    Preliminary Considerations

This court affirms the ALJ's finding that Ms. Readus engaged in substantial gainful activity from December 31, 2005, through December 31, 2006, as the record unambiguously shows that she worked at IPR during that time.  (Tr. 10-11; 118-31). Hereinafter, this court narrows its focus to the ALJ's finding that Ms. Readus was not disabled from December 31, 2006, through February 9, 2008.  (Tr. 11).

The ALJ found that Ms. Readus suffers from the following: lumbar degenerative disc disease with advanced degenerative spondylolisthesis L4-5; vertical segmental collapse L5-S1 with spontaneous anterior fusion; hypertension; congestive heart failure; and non-insulin dependent diabetes mellitus.  (Tr. 11 (citing 20 CFR 404.1520(c))).  It is undisputed that none of these impairments, nor a combination thereof,  constitute those listed in 20 CFR Part 404, Subpart P, App. 1.

Ms. Readus established that she was unable to perform past relevant work and thus, the burden shifted to the ALJ to show that she can perform other work in the national economy, existing in significant numbers.  (Tr. 13); *See Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  The ALJ found that she can perform such work,

17

as she is capable of a full range of sedentary work.  (Tr. 13).

This appeal addresses whether the ALJ applied the correct legal standards and whether his conclusions are supported by substantial evidence.

## II.   The ALJ Applied The Correct Legal Standards In Evaluating Ms. Readus's Condition(s).

When medical evidence fails to establish a disability by itself, the Eleventh Circuit requires an ALJ to apply a three-part pain standard to evaluate objective medical evidence and subjective testimony of pain and symptoms.  To establish a disability, the pain standard requires:

> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).

The ALJ found that Ms. Readus's impairments could be reasonably expected to give rise to the alleged pain, but that the subjective evidence was not credible.

### A.   Substantial evidence supports the ALJ's finding that although Ms. Readus's underlying medical condition could reasonably be expected to produce the alleged symptoms, her subjective claims as to the intensity, persistence, and limiting effects of these symptoms are not credible.

In addition to satisfying the three-part pain standard, a claimant must establish

the credibility of subjective complaints of pain and other symptoms, as such statements do not alone establish disability. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a). Medical records must depict impairments that could reasonably be expected to produce the alleged symptoms. *See id;* s*ee also Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991) (citing *Landry*, 782 F.2d 1551). When it is shown that an impairment could reasonably be expected to produce the symptom(s) alleged, the ALJ weighs evidence of intensity and persistence of symptom(s) against all evidence. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). In *Wilson v. Barnhart*, the Eleventh Circuit found that an ALJ's decision was proper because "[he reasonably decided to] reject [claimant's] subjective testimony, articulating, in detail, the contrary evidence as his reasons for doing so." *Id.*, 284 F.3d 1219, 1226 (11th Cir. 2002).

In this case, the ALJ reasonably concluded that Ms. Readus's testimony and other statements as to the intensity, persistence, and limiting effects of her pain and other symptoms were not credible and he sufficiently articulated the reasons on which he based his decision. In particular, the ALJ found that Ms. Readus was not credible because her daily activities were inconsistent with her allegations of pain and her receipt of state unemployment benefits on and off throughout her entire alleged disability period were inconsistent with her subjective allegations of pain and her claim of disability.

19

Ms. Readus argues that the ALJ's finding that her testimony and statements were inconsistent with her daily activities, which includes some driving, is insufficient to support a finding that she is not credible.  Ms. Readus based this argument on *Lewis v. Callahan*, where the Eleventh Circuit said that "participation in everyday activities of short duration, such as housework or fishing" does not necessarily disqualify a claimant from disability.  *Id.*, 125 F.3d 1436, 1441 (11th Cir. 1997).  While true, driving is not necessarily an activity of short duration.

Even so, Ms. Readus's testimony that she is able to drive, combined with the evidence that she received state unemployment benefits, is a substantial evidentiary basis on which to reasonably conclude that she "has very poor credibility."  (Tr. 14).

Moreover, this court has found other evidence in the record supporting the ALJ's finding that Ms. Readus was not credible because, in her application and her testimony, she apparently tried to downplay the amount of time she was employed, even if part-time.  For example, Ms. Readus testified that she was employed by IPR for only three months but her wage records confirm that she worked there from July of 2006 through January of 2007.  (Tr. 121-23, 136-37).  Additionally, she indicated on her application that she never worked at Pleasant Grove.  (Tr. 132).  However, she testified that she worked there for two months, while her wage records confirm that she was employed there from the first quarter of 2006 through the first quarter of

2007. (Tr. 28; 120-26).  Likewise, Ms. Readus stated in her Disability Report that she stopped working at Huntsville Hospital on December 6, 2005, while the hospital records state that she worked there until January of 2006.  (Tr. 140; 150-51).

The record is also  inconsistent as to Ms. Readus's reason for leaving her job at Huntsville Hospital.  In her Disability Report, Ms. Readus stated that she stopped working on December 6, 2005, because her physician instructed her to do so, and the hospital would not "give her another job." (Tr. 150-51).  However, she provided no evidence that she was medically restricted from work in December 2005.

Instead, even though Dr. Aust expressed reservations in doing so, <u>he nonetheless cleared Ms. Readus to return to medium work in August 2005</u>. (Tr. 218). Furthermore, Dr. Aust noted that <u>Ms. Readus told him that she had stopped working due to back pain, during her visit to him on January 17, 2006</u>. (Tr. 217).  Ms. Readus provided no other medical opinions dated around December 6, 2005, much less any such opinions instructing her to quit her job. Furthermore, Ms. Readus repeatedly testified that Huntsville Hospital fired her because of her back.  (Tr. 31-2; 43).

Also irreconcilable with Ms. Readus's claim that she stopped working due to back pain is her receipt of state unemployment benefits during the first quarter of 2006, which is temporally close to the time she stopped working at Huntsville Hospital.  (Tr. 128-29). In Alabama, a person cannot receive state unemployment

21

benefits unless they are "ready, willing, and able to work," and their reason for being unemployed is not due to a disability.  Ala. Code § 25-4-77-78 (1975).

Therefore, substantial evidence supports the ALJ's negative credibility finding.

**B.     The record includes substantial evidence that the objective medical evidence of Ms. Readus's condition did not establish that she is unable to perform a full range of sedentary work.**

While the objective medical evidence shows that Ms. Readus has degenerative disc disease, it does not show that her condition is deteriorated such that she cannot perform anything less than light work, with the restrictions imposed by Dr. Aust.

The medical opinions of Dr. Aust, her treating physician, and Dr. Cotter, a consultative medical examiner, are the only evidence that suggest  Ms. Readus has limited capabilities in the workplace.  Dr. Aust recommended that Ms. Readus limit herself to light work, including no lifting over 25 pounds and no repetitive lifting, bending, or stooping.  Although he continued to see her up to January of 2006, he never imposed heavier work-related limitations on her.

Five months later, in May of 2006, Dr. Cotter examined Ms. Readus and concluded that her long term prognosis is "poor." (Tr. 261).  He based his conclusion on Ms. Readus's subjective complaints; the fact that she has seen an orthopedic surgeon; and the fact that she "has other debilitating problems as well." *Id*.

1.      **The ALJ's reliance on Ms. Readus's treating physician's opinion is supported by substantial evidence.**

Ms. Readus argues that the ALJ improperly discounted the opinion of Dr. Cotter, a consultative examiner, in favor of the "out-dated" opinion of her treating physician, Dr. Aust.  (Pl.'s Br. 7).  The Eleventh Circuit requires the ALJ to give weight to the treating physician's opinion, but if he chooses not to do so, he must show good cause why he chooses to not do so.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  The opinion of a treating physician as to the plaintiff's condition and the medical consequences thereof is entitled to deference, absent good cause.  *Id.*; *see* 20 C.F.R. §§ 404.1527, 416.927 (1998).  Good cause exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citing *Lewis*, 125 F.3d at 1440).

Here, there is no good cause to reject Dr. Aust's opinion.  His opinions were detailed and specific.  In particular, he imposed certain work-related restrictions.  Further, Ms. Readus provided no medical opinions, rendered subsequent to Dr. Aust's opinions, that her condition had advanced so as to render his opinion inaccurate.

Even though Dr. Cotter examined Ms. Readus five months after her last visit

to Dr. Aust, the record does not show that he objectively assessed how her condition had progressed since she had last seen Dr. Aust.  He did not conclude, nor perform any laboratory tests on which he could have concluded, that her condition had worsened, much less significantly deteriorated, so as to warrant heavier work-related restrictions.  In fact, his diagnoses were comparable to those of her previous doctors.

Dr. Cotter also based his opinion on Ms. Readus's exaggerated subjective complaints.  (Tr. 261).  He took Ms. Readus's word when she told him that she had been unable to work since she was injured in March of 2005, which was not true.  (Tr. 258).  It also appears that Dr. Cotter believed her claim that "her spine was 'cracked' all the way down," which a simple x-ray would have revealed was incorrect.  *Id*.

Also, the fact that a medical opinion may be more recent than another, while relevant to the patient's current condition, does not automatically invalidate the older opinion.  This is especially true here, as Dr. Cotter's assessment of Ms. Readus's condition was based on her subjective complaints and her older medical records. Moreover, he offered no new insight as to how her condition limited her ability to be gainfully employed.

Ms. Readus also argues that Dr. Cotter's opinion shows that she could no longer work due to back pain by December 31, 2006, because "[her back] obviously worsened during that time period."  (Pl.'s Br. 7).  However, Dr. Cotter's conclusory

24

opinion did not speak to how her condition would likely progress. In fact, no evidence on record establishes that her condition ever became so bad that she was altogether unable to do light work, must less a full range of sedentary work. Relatedly, Ms. Readus did not answer the ALJ's request for further medical records to support her claim, which she testified existed, and did not offer an excuse. (Tr. 8).

> **2.    Even if the ALJ had not discounted the opinion of the consultative examiner, substantial evidence still supports a finding that the objective medical evidence is insufficient to establish disability.**

The ALJ stated that he discounted Dr. Cotter's opinion in favor of Dr. Aust's because Dr. Cotter had only examined Ms. Readus once and his long term prognosis that she is "poor" was "non-specific." (Tr. 14). However, Dr. Cotter's opinion was not necessarily inconsistent with that of Dr. Aust. The only difference between the opinions is that Dr. Cotter described Ms. Readus's long term prognosis as "poor." Thus, even if the ALJ had relied on Dr. Cotter's opinion, substantial evidence still favors a finding of not disabled.

**III.    The ALJ Fully And Fairly Developed The Record In Relying Solely On The Medical-Vocational Guidelines To Determine That Ms. Readus Is Capable Of Performing Jobs In The National Economy.**

The ALJ determined that Ms. Readus has the RFC to perform a full range of sedentary work. (Tr. 12-13). Thus, she can perform jobs in the national economy.

*Id.*; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

"In this Circuit, the preferred method of demonstrating job availability where a plaintiff is unable to perform a full range of work at a given functional level or when a claimant has both exertional and nonexertional limitations is through the testimony of a vocational expert." *Welch v. Bowen*, 854 F.2d 436, 439-440 (11th Cir. 1986)). Despite this preference, in *Heckler v. Campbell*, 461 U.S. 458 (1983), the Supreme Court held that the use of grids to assess job existence in the national economy is a proper use of regulatory power under the SSA. "The *Campbell* court also held that when the grids are properly used the Secretary need not introduce evidence of specific available jobs that the claimant is able to perform despite the existing impairments." *Gibson v. Heckler*, 762 F.2d 1516, 1520 (11th Cir. 1985) (citing *Campbell*, 461 U.S. at 468-472).

Here, the ALJ made a factual determination that Ms. Readus had a RFC to perform a full range of sedentary work. (Tr. 20). Ms. Readus has a limited education; is able to communicate in English; and is a younger individual. (Tr. 14-5). She had performed a range of heavy to unskilled work in the past. (Tr. 44). Under "Table No. 1 - Residual Functional Capacity: Maximum Sustained Work Capability Limited to Sedentary Work as a Result of Severe Medically Determinable Impairments(s)," and rules 201.27-8, the ALJ properly found that Ms. Readus is not

disabled.  20 C.F.R. § 404, Subpart P, App. 2.

In addition to properly applying the first four steps of the five-step process, the ALJ properly used the grids under step five.  Thus, the ALJ applied proper legal standards in determining that Ms. Readus was not disabled.

## CONCLUSION

Based upon an evaluation of the evidence in the record, the court finds that the Commissioner's final decision is supported by substantial evidence and applies the proper legal standards.  Accordingly, the decision will be affirmed by separate order.

**DONE** and **ORDERED** this the 10th day of March, 2010.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

23